UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| DIAMOND CONSTRUCTION, LLC and BELLEVUE PARK HOMEOWNERS ASSOCIATION,<br><br>Plaintiffs,<br><br>v.<br><br>ATLANTIC CASUALTY INSURANCE COMPANY,<br><br>Defendant. | CASE NO. C17-1408-JCC<br><br>ORDER |

This matter comes before the Court on Defendant's motion for summary judgment (Dkt. No. 13). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby GRANTS the motion for the reasons explained herein.

I.    **BACKGROUND**

In 2016, Plaintiff Diamond Construction, LLC ("Diamond") contracted to replace the roof on the Bellevue Park Condominiums. (Dkt. No. 23 at 2.) The new roofing assembly included two layers—a Polyglass base sheet and a top torch-down membrane. (*Id*.) Diamond began the project by applying the base sheet before moving on to the membrane. (*Id*. at 3.) By the end of the second workday, Diamond had not finished applying the membrane and was expecting an overnight rainstorm. (*Id*.) Before leaving the job site, Diamond's crew rechecked

the base sheet to ensure it had been properly adhered to the roof. (*Id.*) The crew ensured adhesion by taping down small gaps in the base sheet's seams (referred to as "fishmouths"), and going over the seams with a small roller. (*Id.* at 3.) In a few areas, workers applied heat to ensure the seams were tightly sealed. (*Id.*)

Early the next morning, Diamond's owner, Eugene Kuzmenko, learned that water was leaking through the roof and causing damage to several units inside the building. (*Id.* at 3–4; Dkt. No. 14 at 35.) When Mr. Kuzmenko arrived at the project he discovered multiple small tears and penetrations in the base sheet, which he surmised were caused by his crew moving equipment and supplies around on the roof before leaving the day before. (Dkt. No. 23 at 3.)

Mr. Kuzmenko made a claim with Diamond's insurance carrier, Defendant Atlantic Casualty Insurance Company ("Atlantic"), for the water damage to the units. (*Id.* at 4.) Atlantic conducted an investigation and denied Diamond's claim. (Dkt. No. 14 at 34.) In its denial letter, Atlantic stated, among other things, that the water damage was excluded under the policy's roofing endorsement because Diamond had not used a suitable rain cover when it left the work site, and the project involved the use of a membrane requiring heat for application. (*Id.* at 7, 43; Dkt. No. 13 at 5.)

After Atlantic denied Diamond's claim, Plaintiff Bellevue Park Homeowners Association ("Bellevue Park") filed a lawsuit in state court against Diamond seeking to recover damages caused by the rain. (Dkt. No. 21 at 2.) Diamond's attorney sent Atlantic a letter demanding that the insurer defend it against Bellevue Park's lawsuit. (*Id.*) Atlantic never responded to Diamond's tender of defense. (*Id.*) Diamond subsequently filed this lawsuit, alleging that Atlantic breached the terms of its insurance policy, acted in bad faith, and violated the Washington State Consumer Protection Act ("WCPA"). (Dkt. No. 1 at 5–7.) Diamond and Bellevue Park have since settled their case, with Bellevue Park receiving a covenant judgment

1 and assignment of Diamond's claims against Atlantic.[1] (Dkt. No. 28 at 3.)

2 Atlantic filed this motion for summary judgment asserting that Plaintiffs' claims should
3 be dismissed because "three exclusions to Atlantic's policy plainly, unambiguously and
4 independently eliminate coverage." (Dkt. No. 13 at 1.) Atlantic additionally asserts that
5 Plaintiffs' bad faith and WCPA claims should be dismissed if the Court finds that the insurer's
6 denial of coverage was reasonable. (*Id*. at 2.)

## II. DISCUSSION

### A. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making such a determination, the Court must view the facts and justifiable inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 255 (1986). Once a motion for summary judgment is properly made and supported, the opposing party "must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). Material facts are those that may affect the outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248–49.

### B. Atlantic's Motion for Summary Judgment

Atlantic asserts that it properly declined Diamond's claim based on any of three policy exclusions. First, Atlantic asserts that the policy excluded rain damage that resulted from Diamond's failure to use a suitable waterproof cover on the roof. (Dkt. No. 13 at 10.) Second, Atlantic argues that the policy excluded any damage resulting from operations that involved the application of a membrane roofing system requiring heat for application. (*Id*. at 12.) Third,

---

[1] The Court granted the parties' stipulation to join Bellevue Park as a Plaintiff. (Dkt. No. 30.) The Court will refer to Diamond and Bellevue Park collectively as "Plaintiffs."

Atlantic asserts that the policy excluded any property damage that arose from Diamond's ongoing operations.[2] (*Id.* at 15.)

The following legal principles guide the Court in assessing Atlantic's claims. Under Washington law, courts are to construe insurance policies as contracts. *Weyerhaeuser Co. v. Commercial Union Ins. Co.*, 15 P.3d 115, 122 (Wash. 2000). Policies are to be considered as a whole, with individual provisions given a "fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance." *Quadrant Corp. v. Am. States Ins. Co.*, 110 P.3d 733, 737 (Wash. 2005) (citation and internal quotations omitted). An insurance clause is ambiguous if "on its face, it is fairly susceptible to two different interpretations, both of which are reasonable." *Id*. (citation omitted). Because Washington law requires insurance contracts to be liberally construed in favor of coverage, "any doubts, ambiguities and uncertainties arising out of the language used in the policy must be resolved in [the insured's] favor." *Phil Schroeder, Inc. v. Royal Globe Ins. Co.*, 659 P.2d 509, 511 (Wash. 1983) (citation and internal quotations omitted).

Under Diamond's commercial general liability policy, Atlantic is responsible to pay all sums that Diamond becomes legally obligated to pay as damages because of "property damage." (Dkt. No. 15 at 60.) The policy defines property damage as "[p]hysical injury to tangible property, including all resulting loss of use of that property." (*Id*. at 72.) Atlantic also has a duty to defend Diamond against any lawsuit seeking damages arising from property damage Diamond caused. (*Id*. at 60.)

        1.    <u>Rain Cover Exclusion</u>

Diamond's policy includes a roofing endorsement that contains the following exemption:

> This insurance does not apply to any claim, loss, costs or expense due to "property damage" arising out of rain, snow, hail or any combination of these if a suitable waterproof temporary covering, able to withstand the normal elements and large

---

[2] The parties refer to this exclusion using the relevant policy provision, "j(5)."

> enough to cover the area being worked on, has not been properly secured in place. This cover is to be put into place any time any insured leaves the job site. Relative to roofing operations, the use of tar paper and/or felt paper does not constitute suitable waterproof temporary covering.

(Dkt. No. 15 at 119.) Atlantic asserts that Diamond failed to properly secure a suitable waterproof covering over the roof prior to leaving the worksite the night before the rain damage occurred. (Dkt. No. 13 at 11.) Atlantic argues that the Polyglass base sheet was not a "temporary covering" within the meaning of the policy exclusion. (*Id*.) Even if it was considered a temporary covering, Atlantic argues that Diamond failed to properly install the Polyglass base sheet such that it did not provide "suitable waterproof protection." (*Id*.) Atlantic further asserts that the base sheet was an improper cover because the building had a flat roof that did not allow for drainage. (*Id*.) Atlantic supports its position with a report written by a structural engineer, Peter Mattes, who concluded that "the cause of the leaking water was a failure of the watertight seal of the roofing underlayment, due to an improper use and installation of the underlayment." (Dkt. No. 14 at 8.) Mr. Mattes' opinion was partially based on photos taken of the roofing project the day before the damage occurred, which showed several fishmouths along the base sheet. (*Id*.)

Plaintiffs counter that there is a genuine dispute of fact regarding its use of the Polyglass base sheet as a waterproof cover. (Dkt. No. 19 at 9.) Plaintiffs provide a declaration from a roofing industry consultant, Aaron Nelson, who states that a correctly installed Polyglass base sheet is waterproof. (Dkt. No. 22 at 2.) Mr. Nelson further states that such base sheets are often used as overnight coverings in the roofing industry because they are waterproof. (*Id*.) In addition, Mr. Kuzmenko stated that he instructed his crew to check the base sheet for proper adhesion prior to leaving the job site. (Dkt. No. 23 at 3.) According to Mr. Kuzmenko, his crew removed all fishmouths in the base sheet by taping down gaps in the seams, rolling the gaps, and using heat application where necessary. (*Id*.) Mr. Kuzmenko also stated that the pictures Mr. Mattes relied on were taken prior to his crew repairing the fishmouths on the base sheet. (*Id*. at 4.)

Based on the foregoing evidence, the Court concludes there are genuine disputes of material fact regarding whether the Polyglass base sheet provided a suitable waterproof covering.

These disputes prevent the Court from concluding that the rain cover exclusion barred coverage.

Therefore, Diamond's motion for summary judgment pursuant to the rain cover exclusion is DENIED.

2.  Heat Application Exclusion

The policy's roofing endorsement also exempts coverage for:

> Any claim, loss, costs or expense for "bodily injury," "property damage" or "personal and advertising injury" as a result of any operations, from initial inspection and pre-installation work to ongoing operations and including completed operations, involving any hot tar, wand, sprayed or sprayed-on material, torch or heat applications, hot membrane roofing or any membrane roofing system requiring heat for application.

(Dkt. No. 15 at 119.) Atlantic asserts that this provision applies because it is undisputed that "Diamond's operations on the condominium's roof involved a membrane roofing system that required heat for application." (Dkt. No. 13 at 12.) It is also undisputed that Diamond applied heat to some areas of the base sheet in order to ensure adhesion. (*Id.*; Dkt. No. 23 at 3.) Atlantic directs the Court to various out-of-jurisdiction cases where courts have applied this provision to exclude coverage for any property damage resulting from the provision of a membrane roofing system requiring heat for application. (Dkt. No. 13 at 13) (citing *Atl. Cas. Ins. Co. v. Sealtite Roofing & Constr. Co.*, 73 F. Supp. 3d 953, 961 (N.D. Ill. 2014)).

Plaintiffs argue that the Court should not read the exclusion so broadly. (Dkt. No. 19 at 11.) Plaintiffs assert that the exclusion only applies when property damage is caused "as a result of any operations" that involve the use of "torch or heat applications, hot membrane roofing or any membrane roofing system requiring heat for application." (*Id.*) Plaintiffs argue that the exclusion does not apply because the water damage was caused by holes in the base sheet and had nothing to do with its application of heat or the use of the membrane roofing system. (*Id.*)

The Court concludes that the exclusion is ambiguous because it is unclear whether and to what extent the relevant property damage must be related to the insured's operations. The provision could be interpreted broadly, as Atlantic suggests, to exempt all property damage that

arises from operations involving the use of certain roofing methods. (*See* Dkt. No. 13 at 12.) But Plaintiffs also offer a reasonable interpretation—that the property damage must be related to the operations where the applicable roofing methods are used. (*See* Dkt. No. 19 at 11.)

Given this ambiguity, the Court is free to consider extrinsic evidence that goes to the parties' intent concerning the exclusion's scope. *Quadrant Corp.*, 110 P.3d at 737. Diamond produced its insurance application, in which the company disclosed that it uses torch applied roofing materials on five percent of its projects. (Dkt. No. 23-5 at 5.) That Atlantic issued the policy notwithstanding this disclosure suggests that the exclusion should not be read broadly—if it were, Atlantic would have issued a policy that did not cover some of Diamond's operations.

The Court also agrees with Plaintiffs that Diamond's proposed interpretation would lead to nonsensical results. (Dkt. No. at 19 at 12.) Atlantic's reading would exclude coverage for any damage that occurred while Diamond was using torch applied roofing materials—damage caused by a worker dropping a hammer from the roof and hitting a pedestrian, or damage caused by a helicopter crashing into the roof. While other courts around the country may have adopted such an expansive interpretation, this Court will not. *See Sealtite Roofing & Constr. Co.*, 73 F. Supp. 3d at 961. Construing the clause narrowly and against the insurer, the Court concludes that the exclusion only applies where there is some causal link between the property damage and the operations that involve the use of "torch or heat applications, hot membrane roofing or any membrane roofing system requiring heat for application." (*See* Dkt. No. 15 at 119.)

There is a genuine dispute of fact regarding whether the water damage resulted from Diamond's use of heat on the Polyglass base sheet. Atlantic asserts that Diamond did not adequately use heat to seal the base sheet, which allowed water to leak into the building. (Dkt. No. 13 at 15.) Plaintiffs have rebutted that assertion with Mr. Kuzmenko's testimony, who states that the water was leaking through holes in the base sheet. (Dkt. No. 23 at 3.) This dispute of fact prevents the Court from concluding that the exclusion barred coverage of the water damage.

Therefore, Atlantic's motion for summary judgment pursuant to the heat application

exclusion is DENIED.

### 3. J(5) Ongoing Operations Exclusion

Atlantic asserts that the policy's ongoing operations exclusion also exempts coverage of the water damage. (Dkt. No. 13 at 15.) That exclusion eliminates coverage for property damage to "that particular part of real property on which [the insured] or any contractors or subcontractors working directly or indirectly on [the insured's] behalf are performing operations, if the 'property damage' arises out of those operations." (Dkt. No. 15 at 63.) Courts in Washington have characterized this type of ongoing operations clause as a "business risk exclusion" that is intended to preclude coverage for the insured's negligent or defective workmanship. *See Canal Indem. Co. v. Adair Homes, Inc.*, 737 F. Supp. 2d 1294, 1302 (W.D. Wash. 2010), *aff'd*, 445 F. App'x 938 (9th Cir. 2011); *W. Nat. Assur. Co. v. Shelcon Const. Grp. LLC*, 332 P.3d 986, 989 (Wash. Ct. App. 2014).

Ongoing operations exclusions like the one in this case apply to damage that occurred at the time the insured is performing operations. *See, e.g.*, *Dewitt Constr. Inc. v. Charter Oak Fire Ins. Co.*, 307 F.3d 1127, 1133 (9th Cir. 2002) (applying an identical ongoing operations exclusion under Washington law); *Canal Indem. Co.*, 737 F. Supp.2d at 1301 (concluding that an identical exclusion "bars coverage for damages occurring during [the insured's] construction of the home"); *Vandivort Constr. Co. v. Seattle Tennis Club*, 522 P.2d 198, 202 (Wash. Ct. App. 1974) (holding that a similar provision applied to damage occurring while insured was performing operations on the property). The exclusion also applies to damage that occurs as a result of ongoing operations. *See Atl. Cas. Ins. Co. v. Johnny's Quality Exteriors, Inc.*, 131 F. Supp. 3d 1077, 1086 (E.D. Wash. 2015) (holding that an identical exclusion precluded coverage of property damage caused when wind blew over a partially constructed wall); *Vandivort Constr. Co.*, 522 P.2d at 202 (holding that a similar exclusion precluded coverage for damage to property adjacent to construction site because injuries "arose out of [insured's] operations.").

In this case, it is undisputed that the water damage occurred while Diamond's operations

were ongoing. Diamond had not completed installing the new roof when the water leaked into the building. (Dkt. No. 23 at 2–4.) Diamond discovered the water damage when it returned the next day to finish the roof. (*Id*. at 3.) Moreover, Mr. Kuzmenko states that the holes that allowed water to leak into the building were caused by his crew moving equipment and supplies over the roof. (*Id*.) Therefore, the damage arose directly from Diamond's operations installing the roof. *See Dewitt Constr. Inc.*, 307 F.3d at 1133.

Plaintiffs suggest that the j(5) provision "only excludes damage while work is actively being performed on the project." (Dkt. No. 19 at 12.) Plaintiffs' interpretation is neither supported by the plain meaning of the j(5) exclusion, nor the relevant case law dealing with similar clauses. Further, Plaintiffs' suggestion that the Court should read the exclusion narrowly is contrary to all of the cases interpreting identical provisions. *See Canal Indem. Co.*, 737 F. Supp.2d at 1301; *Shelcon Const. Grp. LLC*, 332 P.3d at 988. Given the undisputed facts, the Court concludes that the property damage in this case arose from Diamond's ongoing operations at the Bellevue Park Condominiums. Therefore, Atlantic's motion for summary judgment on Plaintiffs' breach of contract claim is GRANTED.

    4.    <u>Bad Faith and WCPA Claims</u>

The fact that the Court has granted summary judgment to Atlantic on Plaintiffs' breach of contract claim does not necessarily preclude Plaintiffs' bad faith and WCPA claims. *See St. Paul Fire & Marine Ins. Co. v. Onvia, Inc.*, 196 P.3d 664, 669–70 (Wash. 2008) (holding that third-party insured has a cause of action for bad faith claims handling and violation of Consumer Protection Act that are "not dependent on the duty to indemnify, settle, or defend."). An insurer can be liable for bad faith handling of an insured's claim regardless of whether the insurer's coverage decision was ultimately correct under the policy. *See Coventry Assocs. v. Am. States Ins. Co.*, 961 P.2d 933, 937 (Wash. 1998).

    *a.*    *Bad Faith Claim*

An insurer owes to its policyholder a duty of good faith, the violation of which may give

rise to an action in tort for bad faith. *Truck Ins. Exch. v. Vanport Homes, Inc.*, 58 P.3d 276, 284 (Wash. 2002). Insurer bad faith claims "are analyzed applying the same principles as any other tort: duty, breach of that duty, and damages proximately caused by any breach of duty." *Smith v. Safeco Ins. Co.*, 78 P.3d 1274, 1277 (Wash. 2003) (citation and internal quotations omitted). To establish bad faith by an insurer, an insured must show that the insurer's breach of the insurance contract or failure to defend was unreasonable, frivolous, or unfounded. *Kirk v. Mt. Airy Ins. Co.*, 951 P.2d 1124, 1126 (Wash. 1998). Whether an insurer acted in bad faith is a question of fact that the insured bears the burden of proving. *Smith*, 78 P.3d at 1277.

Plaintiffs allege that Atlantic acted in bad faith when it failed to respond to Diamond's demand that the insurer defend it against Bellevue Park's lawsuit. (Dkt. No. 19 at 15.) Plaintiffs further allege that Atlantic acted in bad faith by failing to disclose Mr. Mattes' report with its denial of coverage letter and issuing Diamond a policy despite knowing the contractor used a method of roofing that the policy purportedly did not cover.[3] (*Id*. at 18–19.)

On February 16, 2017, Diamond's attorney, Spencer Freeman, sent Atlantic a letter notifying the insurer of Bellevue Park's lawsuit. (Dkt. No. 21-1 at 2.) In the letter, Mr. Freeman "demanded that Atlantic Casualty provide defense for Diamond Construction." (*Id*.) Mr. Freeman states that on February 17, 2018, he mailed a copy of the demand letter and Bellevue Park's complaint to the adjuster that handled Diamond's initial tender. (Dkt. No. 21 at 2.) Atlantic never responded to Diamond's tender of Bellevue Park's complaint, until it filed its

---

[3] The Court concludes that neither of these actions represent bad faith, as a matter of law. Plaintiffs suggest Atlantic was required to disclose Mr. Mattes' report along with its denial letter, based on a regulation prohibiting insurers from "[m]isrepresenting pertinent facts or insurance policy provisions." (Dkt. No. 19 at 18) (citing WAC 284-30-330(1)). The Court fails to see how that regulation required Atlantic to disclose Mr. Mattes' report along with its letter explaining its reasons for denying coverage. (*See* Dkt. No. 14 at 34–44.) Nor did Atlantic act in bad faith by selling Diamond a policy which potentially excluded some of Diamond's roofing projects. The Court has already declined to interpret the policy in a way that would have barred coverage for Diamond's mere use of a membrane roofing system requiring heat for application. *See supra* Part II.B.2.

answer to Diamond's complaint on November 2, 2017. (*See* Dkt. Nos. 8; 14 at 2.)

In response, a senior claims adjuster for Atlantic states that the insurer "has no record of ever receiving [Diamond's] February 16, 2017 letter and tender." (Dkt. No. 14 at 2.) The claims adjuster further states that "had it received the tender, Atlantic would have reviewed the complaint, re-evaluated its coverage position, and responded to the tender." (*Id*.) In its initial denial letter, Atlantic stated that "[i]f suit is filed, please forward a copy to us so we may re-evaluate coverage under the policy at that time." (*Id*. at 44.)

There is a genuine dispute of material fact regarding whether Atlantic breached its duty of good faith by failing to respond to Diamond's tender of Bellevue Park's complaint. Under Washington law, insurers have a statutory duty to "acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies." *See* WAC 284–30–330(2). Insurers also have a duty to conduct a reasonable investigation after receiving a claim or tender of defense. *Id*. at (3)–(4); *see also St. Paul Fire & Marine Ins. Co.*, 196 P.3d at 669 (holding that insurers have a "specific duty to act with reasonable promptness in investigation and communication with their insureds following notice of a claim and tender of defense.")

It is undisputed that Atlantic failed to respond or to conduct an investigation into Diamond's tender of defense. (Dkt. Nos. 21 at 2, 14 at 2.) There is a dispute of fact regarding whether Atlantic's failure to respond was unreasonable—that is, whether Atlantic received Diamond's tender and failed to act. Viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could find that Atlantic acted unreasonably in failing to respond to Diamond's tender.[4] *See Anderson*, 477 U.S. at 248–49.

Atlantic argues that it could not have acted in bad faith by failing to defend Diamond

---

[4] Atlantic partially acknowledges this dispute of fact in its reply brief: "[I]f this Court does not grant summary judgment to Atlantic based on one or more of the policy exclusions, there is a factual question as to whether Atlantic ever received Mr. Freeman's February 16, 2017 tender." (Dkt. No. 31 at 9.)

because the policy unambiguously excluded coverage. (Dkt. No. 31 at 8.) Atlantic mistakes a bad faith claim premised on an insurer's breach of the duty to defend—which Diamond did not assert in its complaint—with a bad faith claim premised on an insurer's failure to adequately respond to a claim. *See Absher Const. Co. v. N. Pac. Ins. Co.*, 861 F. Supp. 2d 1236, 1244 (W.D. Wash. 2012) (contrasting bad faith claim based on breach of duty to defend, with bad faith claim based on unreasonable handling of claim); *compare Kirk*, 951 P.2d at 1126–27, *with St. Paul Fire & Marine Ins. Co.*, 196 P.3d at 669.

Atlantic also argues that Plaintiffs have not met their burden to demonstrate the insurer's alleged failure to respond caused Diamond harm. (Dkt. No. 31 at 9.) "[A] showing of harm is an essential element of an action for bad faith handling of an insurance claim." *Safeco Ins. Co. of Am. v. Butler*, 823 P.2d 499 (Wash. 1992). An insured can demonstrate harm by showing it incurred expenses as a result of the insurer's bad faith actions. *See Coventry*, 961 P.2d at 939.

Plaintiffs have not presented evidence that Diamond was directly harmed by a result of Atlantic's failure to respond to its tender of defense. Although Diamond had to hire Mr. Freeman to defend it against Bellevue Park's lawsuit, the contractor did so in response to Atlantic's denial of coverage, not the insurer's non-response to Diamond's tender of defense. (Dkt. No. 21.) Moreover, Diamond would have had to hire Mr. Freeman even if Atlantic had responded to its tender of defense because, as the Court has already found, the insurer's denial of coverage was reasonable under the j(5) exclusion. *See supra* Part II.B.3; *see also Coventry Assocs.*, 961 P.2d at 940 (holding that insured bringing bad faith and CPA claims based on insurer's faulty investigation was not entitled to presumption of harm or coverage by estoppel). Aside from retaining Mr. Freeman, Plaintiffs have provided no evidence that Atlantic's failure to respond to Diamond's tender of defense caused the insured harm.

Atlantic's motion for summary judgment as to Plaintiffs' bad faith claim is GRANTED.

        b.        *WCPA Claim*

To prevail on a WCPA claim Plaintiffs must show: (1) an unfair or deceptive act or

practice (2) in trade or commerce, (3) which affects the public interest and (4) injured the plaintiff's business or property, and (5) that the unfair or deceptive act complained of caused the injury. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 535–39 (Wash. 1986). An insurer's breach of its duty of good faith constitutes a *per se* violation of the WCPA. *See Moratti ex rel. Tarutis v. Farmers Ins. Co. of Wash.*, 254 P.3d 939, 947 (Wash. Ct. App. 2011).

Plaintiffs' WCPA claim is based on the same allegations supporting its bad faith claim. (Dkt. No. 19 at 15–19.) Thus, as with the bad faith claim, Plaintiffs have failed to make a requisite showing that Atlantic's failure to respond to Diamond's tender of defense caused Plaintiffs harm. Therefore, Atlantic's motion for summary judgment on Plaintiff's WCPA claim is GRANTED.

### III. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (Dkt. No. 13) is GRANTED. Plaintiffs' claims are DISMISSED with prejudice.

DATED this 13th day of August 2018.

John C. Coughenour
UNITED STATES DISTRICT JUDGE